639 S.E.2d 460

**Richard ROSS, Respondent,**

v.

**LIGAND PHARMACEUTICALS, INC., Appellant.**

**No. 4190.**

Court of Appeals of South Carolina.

Heard Oct. 12, 2006.
Decided Dec. 21, 2006.

Joseph D. Thompson, III, Lydia B. Applegate, of Charleston, for Appellant.

Donald Higgins Howe, Robert J. Wyndham, of Charleston, for Respondents.

HEARN, C.J.:

Ligand Pharmaceuticals, Inc. appeals the circuit court's order awarding wages, treble damages, and attorney's fees to Richard Ross for Ligand's breach of an employment contract, violation of the South Carolina Payment of Wages Act, and violation of public policy. We affirm.

## FACTS

In October 1998, Ligand offered Ross a position as a Senior Oncology Specialist (SOS). The offer provided a starting salary of $7,166.67 per month and participation "in the 1998 Sales Force Incentive Plan based upon achievement of pre-agreed impact goals and/or sales objectives." The offer further provided that "[a]ny additions or modifications to these terms would have to be in writing and signed by [Ross] and the Company President." Ross accepted the offer and began work with Ligand on November 3, 1998.

Initially, Ross did not participate in a sales incentive plan because Ligand did not have an approved product for distribution; instead, Ross participated in a Management by Objective

Plan that presumably provided for incentives based on non-sales related criteria. Sometime in 1999, Ligand's first product was approved. Subsequently, Ross began participating in the 1999 Sales Force Incentive Compensation Plan (1999 Plan) that permitted him to earn up to thirty-five percent of his salary. The 1999 Plan based compensation on a mathematical formula applied to sales each quarter.

Throughout his employment with Ligand, Ross participated in yearly compensation plans similar to the 1999 Plan. In 2001, however, Ligand changed the plan to provide compensation based on trimester sales. In addition, Ligand altered the compensation plan to provide: "In order to be eligible for the trimester incentive compensation payout, [an employee] must be employed at the time the trimester sales incentive compensation payouts are distributed." These changes were included in the incentive plans for 2001, 2002, and 2003.

In April of 2002, Ligand promoted Ross to Regional Business Manager (RBM). The promotion allowed Ross to participate in the Oncology Regional Business Managers Plan (RBM Plan). The RBM Plan provides: "The Incentive Plan payout will be paid following the conclusion of each trimester period according to the following estimated schedule:

Trimester 1 Payout     June 30, 2003
Trimester 2 Payout     October 31, 2003
Trimester 3 Payout     February 28, 2004."

The "target dates" for the RBM Plan mirrored the scheduled payout dates for the 2001 and 2002 incentive plans.

Ross resigned from Ligand on October 15, 2003. Ross's resignation was effective forty-five days after August 31, 2003, the date the second trimester of 2003 ended. Ligand distributed the payouts for the second trimester of 2003 sometime after November 15, 2003. Ligand declined to pay Ross the incentive plan payout of $12,000 for the second trimester of 2003 because the RBM Plan required that a person must be employed by Ligand, in good standing, at the time the incentive compensation checks were distributed.

Thereafter, Ross filed an action against Ligand alleging the refusal to pay the incentive payout breached the employment agreement and violated the South Carolina Payment of Wages Act. The circuit court held the RBM Plan violated sections 41–

10–30, 41–10–40, 41–10–50, and 41–10–100 of the South Carolina Code (Supp.2005) and public policy. The court also held Ligand breached the employment agreement. The circuit court awarded Ross $36,000 as treble damages pursuant to section 41–10–80 of the South Carolina Code (Supp.2005), attorney's fees totaling $18,000, and costs in the amount of $837.60. This appeal followed.

## STANDARD OF REVIEW

"In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings." *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). The trial judge's findings are equivalent to a jury's findings in a law action. *Id.*

## LAW/ANALYSIS

### I. Payment of Wages Act

Ligand argues the trial judge erred in finding Ligand violated sections 41–10–30 and 41–10–40 of the South Carolina Payment of Wages Act. We disagree.

Section 41–10–30    provides, in relevant part:

(A) Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, *the time and place of payment,* and the deductions which will be made from the wages, including payments to insurance programs. The employer has the option of giving written notification by posting the terms conspicuously at or near the place of work. Any changes in these terms must be made in writing at least seven calendar days before they become effective. This section does not apply to wage increases.

S.C.Code Ann. § 41–10–30 (Supp.2005) (emphasis added).

At trial, Ligand argued the establishment of the "target dates" in the RBM Plan sufficiently complied with the time and place of payment requirements of section 40–10–30. The trial judge found Ligand violated section 41–10–30's requirement to provide the date and place of payment because the

estimated schedule and "target dates" in the RBM Plan did not provide a time for payment as required by the Payment of Wages Act. We find sufficient evidence supports this finding. The RBM Plan provides incentive payouts will be paid according to an estimated schedule with payment on the "target date." In addition, payouts are contingent upon an employee such as Ross being "employed at the time the [payouts] are distributed." Ligand admitted the employee must be employed on the date it ultimately issued the checks, not on the "target date." Ligand testified:

Q: And as I understand your position, the policy of Ligand is in order to get your incentive compensation payment for a particular trimester, you had to be employed when Ligand wrote the check?

A (Ligand): That is correct.

Q: Which could have been on the target date, could have been later?

A: That is correct.

Q: It could have been whenever Ligand decided to write that check, correct?

A: Correct.

Q: And your position is that if you all decided not to write this check for a year and Mr. Ross was not present, then he would not be entitled to the $12,000?

A: That is correct.

Ligand added the estimated payment schedule serves "no purpose, whatsoever, other than guidance to the field." Moreover, the record demonstrates Ligand frequently distributed incentive payout checks after the date listed in the estimated schedule—with four of the previous ten payments being distributed after the "target date."

We agree with the trial judge's determination that Ligand fails to satisfy the statutory requirements of section 40–10–30 because Ligand provided employees with no time certain for when payment would occur. Ligand admitted the key to receiving the earned bonus was the date it arbitrarily selected for distribution of the checks not the "target dates" from the estimated schedule provided to Ross. Providing estimated payment dates that serve "no purpose whatsoever" and are dependent upon employees being employed at the time pay-

outs are distributed, whenever that may be, clearly does not provide notice of "time and date of payment." Accordingly, we affirm the trial judge's finding that the RBM Plan violates section 41–10–30.

Ligand also relies on *Rice v. Multimedia, Inc.,* 318 S.C. 95, 456 S.E.2d 381 (1995), in support of its argument that the RBM Plan complied with the time and place mandates of section 40–10–30. In *Rice,* an employee sought payment for commissions due on advertising contracts under the Payment of Wages Act. *Id.* at 95, 456 S.E.2d at 381. The parties had a contract providing that sales commissions would be paid to a departing employee only for those advertisements sold by the employee and actually broadcast in the month in which the employee left the company. *Id.* at 96, 456 S.E.2d at 382. When the employer refused to pay certain commissions after Rice left the company, Rice sued arguing the departure policy was void as against public policy. *Id.* at 100, 456 S.E.2d at 384. The supreme court disagreed and found the agreement enforceable. *Id.* The court found the agreement was "not arbitrary nor does it violate any law," because the agreement was customary to the industry and provided a valid economic purpose—"to ensure that the salesperson gives continuing service to the client after the sale[.]" *Id.*

We find the factual scenario in this matter distinguishable from *Rice* for three reasons. First, unlike the agreement in *Rice* which was challenged on the ground of public policy rather than because of any violation of the Payment of Wages Act, we have found Ligand's policy violated both sections 40–10–30 and 40–10–40 of the Act. Second, the RBM Plan serves no legitimate purpose, whereas the policy in *Rice* had a clear, legitimate economic purpose; even Ligand admitted its policy serves "no purpose whatsoever." And third, the *Rice* agreement was not arbitrary as it established, in clear terms, the time certain for payment of the commission. In our case, the time for payment was entirely dependent upon Ligand's arbitrary decision of when to issue the commission check to Ross, whenever that date may be, and was not based on any economic reason. In other words, the policy in *Rice* merely established the manner the company would pay admittedly owed commissions, whereas Ligand, under its policy, would not even admit the commissions were due to Ross unless he

was employed by Ligand when it ultimately decided to pay them. Therefore, Ligand's reliance on *Rice* is misplaced.

■ Ligand next contends the circuit court erred in finding Ligand violated section 41–10–40. We disagree.

Section 41–10–40(D) provides "[e]very employer in the State shall pay all wages due at the time and place designated as required by subsection (A) of § 41–10–30." S.C.Code Ann. § 40–10–40(D) (Supp.2005). The trial judge held Ligand violated this section because the company failed to provide Ross with the time that wages earned and due under the RBM Plan would be paid. Evidence exists to support this finding.

Ligand admitted the commissions Ross sought were from sales made during the final trimester in which he worked for the company, and that he was in good standing with Ligand when the trimester ended and when he resigned. Additionally, at the conclusion of Ross' final trimester, there was noting more that he was required to do or participate in to determine the amount of compensation due under the RBM Plan. The sole reason Ligand failed to pay the wages earned during Ross' final trimester was that Ross was not employed when it finally issued the compensation checks, which was several weeks after its own target date had passed. Moreover, as discussed above, Ligand's policy failed to provide the time and place for payment of commissions earned under the RBM Plan; therefore, the failure to provide the time and place of payment prevented Ligand from being able to pay wages due to Ross at the time and place designated as mandated by section 40–10–40(D). Accordingly, we affirm the trial judge's finding that Ligand violated section 41–10–40.

## II. Treble Damages and Attorney's Fees

■ Ligand also contends the trial judge erred in awarding treble damages and attorney's fees to Ross. We disagree.

When reviewing the award of treble damages, this court can take its own view of the facts. *O'Neal v. Intermedical Hosp. of S.C.*, 355 S.C. 499, 509–10, 585 S.E.2d 526, 532 (Ct.App.2003) (citing *The Father v. South Carolina Dep't of Soc. Servs.*, 353 S.C. 254, 578 S.E.2d 11 (2003)). Generally, treble damages may be awarded when the withholding of wages was unreasonable and there was no good faith dispute. *Id.*; *see also Rice v. Multimedia, Inc.*, 318 S.C. 95, 98, 456 S.E.2d 381, 383 (1995).

As our courts have stated: "If there is a dispute over unpaid wages the employer acts at his peril and the court in its discretion may award treble damages when the withholding was unreasonable and there was no good faith wage dispute," and that "the legislature intended to punish the employer who forces the employee to resort to the court in an unreasonable or bad faith wage dispute." *Rice*, 318 S.C. at 99, 456 S.E.2d at 383. Section 41–10–80 provides for the trebling of damages for violation of the Payment of Wage Act:

> In case of any failure to pay wages due to an employee as required by Section 41–10–40 or 41–10–50 the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow. Any civil action for the recovery of wages must be commenced within three years after the wages become due.

S.C.Code Ann. § 40–10–80(C) (Supp.2005).

Ligand admitted the key to receiving the earned bonus was the date Ligand arbitrarily selected for distribution of the checks not the "target dates" from the estimated schedule provided to Ross. We agree with the trial judge that providing estimated payment dates that serve "no purpose whatsoever" and are dependent upon employees being employed at the time payouts are distributed, whenever that may be, is arbitrary and unreasonable. Ligand admitted the commissions Ross sought were from sales made during the final trimester in which he worked for the company, and that he was in good standing with Ligand when the trimester ended and when he resigned. Additionally, at the conclusion of Ross's final trimester, there was nothing more that he was required to do or participate in to determine the amount of compensation due under the RBM Plan. The sole reason Ligand failed to pay the wages earned during Ross's final trimester was that Ross was not employed when it finally issued the compensation checks several weeks after the target date had passed. Moreover, as discussed above, Ligand's policy failed to provide the time and place for payment of commissions earned under the RBM Plan, and this failure prevented Ligand from being able to pay wages due to Ross under the Payment of Wages Act. Accordingly, we agree with the trial judge that Ligand's policy was based on its unilateral, arbitrary decision on when to issue compensation and that no good faith dispute existed. There-

fore, Ross is entitled to treble damages and attorney's fees under section 41–10–80(C).

## CONCLUSION

Accordingly, the circuit court's decision is hereby

**AFFIRMED.**[1]

STILWELL and KITTREDGE, JJ., concur.

---

1. In light of our disposition of this case, we need not address Appellant's remaining issues relating to (1) the circuit court's finding that the compensation plan violates public policy or (2) the breach of contract action. *See Whiteside v. Cherokee County Sch. Dist. No. One*, 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993) (stating appellate court need not address remaining issues when resolution of prior issue is dispositive). However, one issue that warrants discussion is whether Ross consented to the terms of the agreement and is estopped from challenging the policy after his departure. The trial judge found this argument to be without merit because the agreement was void and unenforceable under the Payment of Wages Act. We agree. Section 40–10–100 provides that "no provision of this chapter may be contravened or set aside by a private agreement." Additionally, in *Futch v. McAllister Towing of Georgetown, Inc.*, the supreme court reiterated South Carolina's policy underlying the Payment of Wages Act, stating that our courts "refuse to allow employers to ignore the statute by claiming their employees had by contract or custom waived their statutory right to prompt payment of wages." 335 S.C. 598, 605, 518 S.E.2d 591, 594 (1999). The RBM Plan sought to set aside the requirement of the Act that Employers must provide a "time and place of payment" to employees. As we have held, the arbitrary date of the issuance of the commission checks at the discretion of Ligand is insufficient to comply with the Act. Therefore, any agreement Ross may have consented to would be void under section 40–10–100, and unenforceable against him by Ligand.